**Lucyle KALISH and Sol Joseph Kamen, Plaintiffs,**

v.

**FRANKLIN ADVISERS, INC., Franklin Distributors, Inc., Franklin Administrative Services, Inc., Franklin Resources, Inc., and Franklin Custodian Funds, Inc. (U.S. Government Securities Series), Defendants.**

**No. 87 Civ. 6919 (CSH).**

United States District Court, S.D. New York.

July 24, 1990.

---

Milberg Weiss Bershad Specthrie & Lerach (Richard M. Meyer, of counsel), New York City, for plaintiffs.

Pollack & Kaminsky (Daniel A. Pollack, Martin A. Kaminsky, W. Hans Kobelt, of counsel), New York City, for Franklin Advisers, Inc., Franklin Distributors, Inc., Franklin Administrative Services, Inc. and Franklin Resources, Inc.

Carro, Spanbock, Kastor & Cuiffo (Brian E. Lorenz, of counsel), New York City, for defendant Franklin Custodian Funds, Inc. (U.S. Government Securities Series).

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiffs Lucyle Kalish and Sol Joseph Kamen brought this derivative action on behalf of defendant Franklin Custodian Funds, Inc. (U.S. Government Securities Series) (the "Fund") under the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a–1 *et seq.* (the "Act"), to recoup allegedly excessive advisory fees paid by the Fund to its investment adviser.

Franklin Custodian Funds, Inc. is a diversified open-end investment company registered with the Securities and Exchange Commission under the Act. The Fund is one of five series of Franklin Custodian Funds, Inc., and concentrates its investments in obligations of the Government

National Mortgage Association ("GNMA"), with the objective of income through investment in securities of the U.S. Government or its instrumentalities.

Plaintiffs Kalish and Kamen became shareholders of the Fund in 1986 and 1987 respectively and remained shareholders throughout the pertinent period.

Defendant Franklin Distributors ("Franklin Distributors") acted as the Fund's investment adviser and manager until January 31, 1986, pursuant to contract. Defendant Franklin Advisers, Inc. ("Franklin Advisers") has acted as the Fund's investment adviser under a contract which became effective February 1, 1986 and has been subsequently renewed and modified. Franklin Distributors continues to act as principal underwriter of the Fund. Defendant Franklin Administrative Services, Inc. ("Franklin Services") has acted as shareholder servicing agent, transfer agent and dividend paying agent for the Fund. Each of these companies is a wholly owned subsidiary of defendant Franklin Resources, Inc. ("Franklin Resources"). These entities are from time to time referred to collectively as "Franklin" or "defendants."

Plaintiffs filed their complaint on September 25, 1987, stating a cause of action under § 36(b) of the Act, 15 U.S.C. § 80a–35(b). Plaintiffs alleged that the fees paid by the Fund to Franklin Advisers were exorbitant, and that Franklin Advis-ers and the Fund's directors had breached the fiduciary duty imposed upon them by the Act. The Court granted defendants' motion to strike plaintiffs' demand for a jury trial in a Memorandum Opinion and Order dated February 29, 1988. Following discovery, the case was tried to the Court. This Opinion constitutes the Court's findings of fact and conclusions of law under Rule 52(a), Fed.R.Civ.P.

## BACKGROUND

The Fund was formed in 1971. In 1983 its directors decided to emphasize investment in securities issued by GNMA, popularly known as "Ginnie Maes." That has remained the focus of the Fund's investment policy to this date.

For purposes of limitations and streamlining of proof, this action has been deemed by stipulation to have been commenced on September 30, 1987. At issue are the fees paid by the Fund to Franklin Advisers during its fiscal years ending on September 30, 1987 and September 30, 1988. Those fees were paid pursuant to a series of one-year management agreements between the Fund and Franklin running from February to February, and approved by the Fund's board of directors.

The Fund has experienced dramatic growth since its inception, as revealed by the following table:

| Date | # of Accounts | Net Assets | Outstanding Shares |
|---|---|---|---|
| Dec. 31, 1984 | 178,428 | $ 2,496,954,705 | 351,627,795 |
| Dec. 31, 1985 | 450,980 | $ 8,875,802,045 | 1,180,547,279 |
| Sept. 30, 1986 | 679,542 | $14,361,682,054 | 1,938,886,002 |
| Dec. 31, 1986 | 694,579 | $14,941,488,124 | 2,013,006,042 |
| June 30, 1987 | 687,256 | $14,267,717,200 | 1,994,862,976 |
| Sept. 30, 1987 | 665,410 | $13,024,436,878 | 1,895,183,448 |
| Dec. 31, 1987 | 639,336 | $12,650,664,753 | 1,805,885,572 |
| June 30, 1988 | 621,240 | $12,432,704,402 | 1,760,935,529 |
| Sept. 30, 1988 | 609,925 | $12,112,775,121 | 1,735,011,210 |
| Dec. 31, 1988 | 599,227 | $11,646,328,085 | 1,706,432,500 |
| June 30, 1989 | 570,386 | $11,454,854,549 | 1,639,288,165 |

During the relevant time period, virtually all the assets of the Fund have been invest-ed in obligations of the GNMA. GNMA is

an agency within the United States Department of Housing and Urban Development which acquires mortgages or mortgage purchase commitments, insured or guaranteed by other government agencies, and resells them to private mortgage lenders, such as mortgage bankers, commercial banks and saving and loan associations. These lenders assemble a pool of mortgages which, upon application, are guaranteed by GNMA. The private lenders, also known as "issuers," create and sell to investors certificates representing fractional or total ownership of such. Securities dealers purchase the certificates created by the issuers and resell them to customers such as the Fund. The originator of a pool and issuer of its certificates receives a servicing fee of 44 basis points a year. GNMA receives 6 basis points a year as a guarantee fee.

Ginnie Mae certificates are referred to as "pass-through" securities because the monthly payments of interest and principal on the mortgages in each pool are passed on by the pool originators to the certificate holders, after deduction of the foregoing fees. The nature of Ginnie Mae securities gives rise to certain complexities in respect of managing a fund consisting of them. Openend mutual funds such as the Fund are required to calculate their net asset values on a daily basis and to offer and redeem their shares on a daily basis. Because the individual mortgages making up the pool underlying the certificates might be prepaid as the result of changing interest rates, the calculation of net asset value on a daily basis poses some administrative problems. Uncertainty on prepayments also causes uncertainty in predicting yields, which impacts upon investment decisions.

Throughout the relevant period the Fund has had five directors. Charles B. Johnson and Rupert H. Johnson, Jr. are affiliated with defendants. The three independent, non-affiliated directors are S. Joseph Fortunato, Harris J. Ashton, and Edmund H. Kerr.

The fees paid by the Fund to its investment adviser-manager are approved by the board of directors and included in a contract between the Fund and the adviser. Franklin Distributors acted as the Fund's investment adviser-manager until January 31, 1986. Franklin Advisers has acted as the Fund's adviser-manager under a contract which became effective February 1, 1986, was renewed as of February 1, 1987, and amended in February 1988, effective April 30, 1988. The fees paid by the Fund to Franklin Advisers may be summarized as follows:

### Fee Schedule of the Fund

| | |
|---|---|
| February 1, 1986 through January 31, 1988: | .625% on first $100 million of net assets |
| | .50% on next $150 million |
| | .45% on amounts over $250 million |
| February 1, 1988 (effective April 30, 1988) to present: | .44% on net assets in excess of $10 billion up to $12.5 billion |
| | .42% on net assets in excess of $12.5 billion up to $15 billion |
| | .40% on net assets in excess of $15 billion |

Considerable majorities of the Fund's shareholders voted by proxy to approve each of the management agreements.

Purchasers of shares of the Fund pay a sales charge in accordance with the terms of the prospectus. On a purchase of up to $100,000, the sales charge equals 4% of the gross amount invested. The scale then adjusts downwards by stages to a sales charge of .25% for purchases in excess of $2.5 million. The sales charge is paid with respect to both new purchases and reinvestments of income dividends. One hundred percent of the initial sales charge is

paid to securities dealers who sell the shares. The sales charge on reinvested income dividends is shared with the securities dealers. The sale charges received and retained in recent years may be summarized as follows:

| Year | Amount Retained by Franklin Distributors | Amount Paid to Securities Dealers | Total |
|---|---|---|---|
| 1985 | $ 3,114,000 | $169,066,000 | $172,180,000 |
| 1986 | $16,550,000 | $315,271,000 | $331,821,000 |
| 1987 | $14,357,000 | $ 99,672,000 | $114,029,000 |
| 1988 | $ 8,118,592 | $ 38,224,436 | $ 46,343,028 |

Pursuant to a separate contract, the Fund pays Franklin Services fees on a per-account basis of $6.00 annually. These fees are paid for Franklin Services' work as transfer agent,, dividend disbursing agent and shareholder services agent. For fiscal years ending September 30, the fees have been:

| | |
|---|---|
| 1985 | $1,508,043 |
| 1986 | $3,350,669 |
| 1987 | $4,473,316 |
| 1988 | $4,239,240 |

The parties have stipulated to the Fund's expense ratio, which is obtained by dividing expenses by Fund assets. The expense ratio for fiscal years ended September 30 has been as follows:

| Year | Expense Ratio |
|---|---|
| 1985 | .57% |
| 1986 | .54% |
| 1987 | .52% |
| 1988 | .53% |

At the conclusion of the evidence, plaintiffs' counsel argued in summation that there were three main branches to plaintiffs' case. First, management failed to fully inform the directors, and in fact misled them concerning facts material to evaluation of the management fees. Second, the fees paid by the Fund were excessive by objective standards, whether or not the directors were misled. Third, contrary to the Act and the Fund's agreements with the Franklin affiliates, the Fund improperly was made to shoulder distribution expenses which were properly the obligation of other Franklin entities. Tr. 533–34. As will be seen, these contentions overlap considerably.

Defendants contend that plaintiffs have failed to prove that the fees paid by the Fund were excessive, or that Franklin and the Fund directors breached their fiduciary duty in that regard.

## DISCUSSION

Section 36(b) of the Act provides:

[T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

The Act also provides that in actions such as that at bar, a plaintiff need not "allege or prove that any defendant engaged in personal misconduct," but plaintiff does have "the burden of proving a breach of fiduciary duty." § 36(b)(1). Approval of compensation by the board of directors of the investment company, and ratification by its shareholders, "shall be given such consideration by the court as is deemed appropriate under all the circumstances." § 36(b)(2).

The legislative history reveals that the statute does not forbid an adviser-manager from earning a profit on services provided by it to a fund; that a "cost-plus" type of contract is not required; and that the court is not authorized "to substitute its business judgment for that of a mutual fund's board of directors in the area of management fees." S.Rep. No. 91–184, 91st Cong., 1st

Sess., *reprinted in* [1970] U.S.Code Cong. & Ad.News 4897, 4902–03.

A series of cases construing § 36(b) have been tried in this Court and appealed to the Second Circuit. *See Gartenberg v. Merrill Lynch Asset Management, Inc.*, 528 F.Supp. 1038 (S.D.N.Y.1981) (Pollack, J.), *aff'd*, 694 F.2d 923 (2d Cir.1982), *cert. denied sub nom. Andre v. Merrill Lynch Ready Assets Trust*, 461 U.S. 906, 103 S.Ct. 1877, 76 L.Ed.2d 808 (1983) (*"Gartenberg I"*); *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 573 F.Supp. 1293 (S.D.N.Y.1983) (Pollack, J.), *aff'd*, 740 F.2d 190 (2d Cir.1984) (*"Gartenberg II"*); *Schuyt v. Rowe Price Prime Reserve Fund*, 663 F.Supp. 962 (S.D.N.Y.) (Ward, J.), *aff'd*, 835 F.2d 45 (2d Cir.1987), *cert. denied*, 485 U.S. 1034, 108 S.Ct. 1594, 99 L.Ed.2d 908 (1988); *Krinsk v. Fund Asset Management, Inc.*, 715 F.Supp. 472 (S.D.N.Y.1988) (Walker, J.), *aff'd*, 875 F.2d 404 (2d. Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 281, 107 L.Ed.2d 261 (1989). *See also Meyer v. Oppenheimer Management Corp.*, 609 F.Supp. 380 (S.D.N.Y.1984) (Sofaer, J.) *reversed*, 764 F.2d 76 (2d Cir.1985), *on remand*, 707 F.Supp. 1394 (S.D.N.Y.1988), 715 F.Supp. 574 (S.D.N.Y.1989) (Sweet, J.). From these cases a considerable body of instructive precedent has grown.

 In determining whether fund directors have breached their § 36(b) fiduciary duty,

the test is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all the surrounding circumstances.

It follows that:

to be guilty of a violation of § 36(b), therefore, the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could have not been the product of arm's-length bargaining.

*Gartenberg I* at 694 F.2d 928.

The Second Circuit has identified a number of factors to be considered in evaluating the fairness of an adviser-manager's fee. *Gartenberg I* holds that "the principal factor" in evaluating that fairness cannot be "the price charged by other similar advisers to funds managed by them," since "the existence in most cases of an unseverable relationship between the adviser-manager and the fund it services tends to weaken the weight to be given to rates charged by advisers of similar funds." *Id.* at 929. Given that circumstance, the court of appeals continued, "other factors may be more important in determining whether a fee is so excessive so as to constitute a 'breach of fiduciary duty.'" Those other factors "include the adviser-manager's cost in providing the service, the nature and quality of the service, the extent to which the adviser-manager realizes economies of scale as the fund grows larger, and the volume of orders which must be processed by the manager." *Id.* at 930. In expanding the focus beyond fees charged by other advisers, the Second Circuit implemented the legislative history expressed in the Senate report, which made clear that Congress:

intended that the court look at all the facts in connection with the determination and receipt of such compensation, including all services rendered to the fund or its shareholders and all compensation and payments received, in order to reach a decision as to whether the adviser has properly acted as a fiduciary in relation to such compensation.

S.Rep. No. 91–184, *supra* [1970] U.S. Code Cong. & A.D. News at 4910, quoted at 694 F.2d 930.

The Second Circuit in *Gartenberg I* did not eliminate the price charged by other similar advisers from all consideration; its analysis relates more to the weight to be accorded that factor, than its admissibility in the equation. Thus District Judge Walker (as he then was) felt at liberty in *Krinsk* to consider "the advisory fees charged" by other "central asset account funds," although acknowledging that under *Gartenberg I* "such comparisons have limited value due to the lack of competition among advisers for fund business." 715 F.Supp. at 497. The Second Circuit, affirming Judge Walker's dismissal of the complaint

in *Krinsk,* included "comparative fee structures" as a factor to be considered. After reiterating the *Gartenberg I* test of fairness, the court of appeals said in *Krinsk:*

The following factors are to be considered in applying this standard: (a) the nature and quality of services provided to fund shareholders; (b) the profitability of the fund to the adviser-manager; (c) fall-out benefits; (d) economies of scale; (e) comparative fee structures; and (f) the independence and conscientiousness of the trustees.

875 F.2d at 409.

As to comparative expense ratios and advisory fees, the Second Circuit noted the district court's finding "that the Fund's expense ratio and advisory fee are not only consistent with the industry norms, but have been among the lowest of any mutual fund in the industry," although repeating the *Gartenberg I* caution "against providing much weight to this type of comparison." *Id.* at 411–12.

■ Accordingly, while I will give consideration to comparative fee structures in evaluating the fairness of defendants' fees, I will place that factor last in the batting order, and first consider the evidence concerning (a) the nature and quality of Franklin Advisers' services provided to Fund shareholders; (b) the profitability of the Fund to the adviser; (c) whether economies of scale were realized by the adviser-manager and shared with the shareholders; and (d) the role played by the Fund's independent directors. That last factor breaks down into three questions: (1) the expertise of the independent directors; (2) whether they were fully informed about all facts bearing on the adviser-manager's services and fee; and (3) the conscientiousness with which the independent directors performed their duties. *Gartenberg I* at 930.[1]

(a) *The Nature and Quality of the Adviser–Manager's Services Provided to the Shareholders.*

Individuals are drawn to open-end mutual funds by the opportunity to make investments perhaps not otherwise feasible for them; the certainty of professional management and the hope for profit; and liquidity of assets. To accomplish those purposes, funds make available a number of shareholder services. Advisers' services consist in the main of devising an overall investment strategy, including analysis of current projected economic factors, the selection of securities, and the execution of trades. Shareholder services cover a wide range of functions centering around the opening of accounts, redeeming of shares, maintenance of records, and furnishing of information. Fund managers must also insure compliance with federal securities regulations and comparable regulations of the 50 states. Charles B. Johnson dep. 35–38.

Franklin Advisers and Franklin Resources act as investment advisers and managers to a family of about 52 Franklin funds of which the Fund is one. At the times in question, five members of a research staff of about 35 spent more than half their time on the Fund, analyzing investment strategy, conducting portfolio research, executing transactions, and settling administrative problems. Rupert H. Johnson, Jr. dep. 8–9. As the Fund increased in size, Franklin Advisers hired additional people to handle the administrative side of managing trading in Ginnie Maes. Ashton Dep. 17–19. The Franklin group wrote some proprietary computer software to help process and control the administrative functions, but many entries must be made manually. Charles Johnson dep. at 26–27.

Plaintiffs disparage these services. They argue in Proposed Finding of Fact 24 that Franklin Advisers relies upon securities dealers for investment expertise in selecting mortgage pools and does not perform the extensive in-depth research performed by the dealers. Counsel also argued in summation that according to defendants' expert witness Kingman, "the principal function that Franklin performed was a back-office type of function," adding that

---

1. Another factor mentioned by the Second Circuit in *Krinsk,* "fall-out benefits," is not implicated by the facts of the case at bar.

Kingman "conceded that back-office jobs typically on Wall Street garner less prestige and command lower salaries." Tr. 576.

I accept that the securities dealers who trade in Ginnie Mae certificates bring their own expertise to bear. However, as plaintiffs acknowledge, Franklin Advisers' investment committee must make decisions as to the coupon rates at which the Fund will purchase securities; and that function is not performed in a vacuum. Consideration must be given to rate of interest projections. The fact that trading in Ginnie Mae certificates tends to be long term rather than the more hectic pattern of short term, in and out trading does not diminish the importance of sound investment analysis for long-term decisions. As for Kingman, he did say in his deposition that back-office work "is not the glamor side of the business," lacking "the prestige of the investment or marketing side", dep. 33. However, he also said: "It is terribly important to have good managers in the back office or you are in deep trouble." *Ibid.* More significant than these reflections on the social strata of the securities business is Kingman's opinion, expressed in his position paper (DX AU), and unshaken on cross-examination at his deposition:

> Back office problems occur with trading and investing in all types of securities. However, mortgage-backed securities ... necessarily involve more operational problems because of the way the payments are received. Instead of semi-annual payments of interest with principal at maturity, the principal and interest are paid monthly along with any prepayments that have been made on the underlying mortgages. The accounting for these payments is therefore more expensive than for that on any other type of securities.

> In addition, the trading of mortgage backed securities has proved to be a time-consuming task for back office operations personnel. Problems experienced in trade settlement, payment tracking,

and securities clearance are unlike that of any other security in the market.

Kingman was qualified to express these opinions. There is no contrary expert opinion evidence in the record.

On the issue of the nature of defendants' services, I conclude that Franklin Advisers' responsibilities to the Fund in respect of investment advice and management were relatively complex, certainly far more so than plaintiffs were prepared to concede at trial.[2]

As for the quality of these services, there is no evidence that Franklin performed its administrative and management duties in less than an efficient and satisfactory manner. Plaintiffs offered no specific complaints, on their part or in connection with any other investors. Plaintiffs did adduce evidence that in past years two of Franklin's officers had been sanctioned by regulatory agencies for improper record keeping. That proof does not rise much above the level of establishing that defendants hired humans instead of recording angels. Plaintiffs' evidence on the point is more than offset by a series of apparently unsolicited letters from investors praising the quality of Franklin employees' services. *See* DX X. Furthermore, a 1988 independent industry survey of broker/dealers rated Franklin first in the quality of its services to those entities. DX BU.

Given investors' primary objective of making money, the most significant indication of the quality of an investment adviser's services is the fund's performance relative to other funds of the same kind. *See Krinsk*, 875 F.2d at 409.

The traditional yardsticks measuring performance are yield and expense ratio. They determine what the investor gets and how much he pays for it. A leading source of statistics on mutual fund performances is Lipper Analytical Services, Inc. Lipper statistical tables in evidence (DX AD, BE), furnished to the Fund's directors, show that for the fiscal years ending September

---

**2.** At his deposition plaintiff Kamen acknowledged that the Ginnie Mae funds were complicated, required expert management, and he would not be comfortable investing in them himself. Rep. 15–16, 24–25.

30, 1987 and 1988, in a universe of fixed income funds with assets in excess of $5 billion, the Fund had the highest total return of them all. All the funds in that universe were government securities funds. In a universe of fixed income funds with assets over $2 billion, most of which were government securities funds, the Fund ranked fourth out of 23 for the fiscal year ended September 30, 1987, and fourth out of 18 for the fiscal year ended September 30, 1988.

Those impressive yields were coupled with an expense ratio comparing favorably with industry experience. Defendants offered two studies by Lipper comparing the fees and expense ratios of Franklin funds (including the Fund) with the fees and expense ratios of funds of similar objective and size managed by other firms. DX AA is a Lipper report dated July 30, 1987. The report analyzes the Fund's expense ratio for the most recently reported fiscal year (September 30, 1986). Franklin placed second in a universe of 13, which means that only one of the funds in the 13–member peer group had lower expense ratios than the Fund. That study was updated in a report dated November 1989, DX BF, in which the Fund placed second in a peer group of 16.[3]

Plaintiffs called an expert to compare the Fund's performance with another Ginnie Mae mutual fund, with results less favorable to Franklin. Plaintiffs' expert witness, John Livingstone, holds a doctorate in business, teaches accounting and business strategy at the graduate level, and is a principal in a management consulting company advising corporations in accounting, finance and economics. Livingstone has never been a director of a Ginnie Mae fund, employed by an adviser of such a fund, or participated in the negotiation of a management fee for a Ginnie Mae fund.

Livingstone focused upon the Vanguard GNMA Fund. He added Vanguard to the 13 funds the directors were given as part of management's fee presentation. *See* DX 35 (pp. 1–3). The statistics show that Vanguard outperformed the Fund in respect of expense ratio and yield. As to expense ratio, Vanguard's total expense ratio for the most recently reported fiscal year was 0.350%. The Franklin Fund ranked fifth lowest at 0.545%. The highest total expense ratio amassed in the universe of 14 was Colonial Government Securities Plus, at 1.102%.

As to total yield, Livingstone compared Franklin and Vanguard. The comparison was complicated by the fact that the two funds have different fiscal years. Accordingly Livingstone compiled averages over the last five years, four years, three years, and two years. Taking "total return" as the addition of dividends and increases in net asset value, Livingstone computed a five-year average total return for Franklin of 10.03% as to Vanguard's 11.32%; a four year average of Franklin 9.67%, Vanguard 11.35%; a 3–year average of Franklin 10.63%, Vanguard 10.99%; and a two-year average of Franklin 7.25%, Vanguard 8.13%.

Defendants attack plaintiffs' use of the Vanguard GNMA fund as a basis for comparison with the performance of the Franklin GNMA Fund. They contend that the structure of the Vanguard family of funds is unique.

Specifically, Charles Johnson testified that characteristically the funds in the Vanguard family of funds own the management company, and that in consequence the management company renders services to the funds at cost, whereas in the Franklin family, Franklin Advisers seeks to make a profit. Tr. 401–404. Johnson also testified that the capital of "Vanguard Company is supplied by the various funds for which it is the manager," making the operation comparable to "a mutual life insurance

---

**3.** Lipper's is one of two leading recognized statistical sources of mutual fund performance. The other is Donoghue's. *See Schuyt,* 663 F.Supp. at 970 n. 24, 976; *Krinsk,* 715 F.Supp. at 487 n. 31, 32. No analyses from Donoghue's services were offered at trial. Plaintiffs introduced through their expert witness Livingstone a statistical comparison less favorable to Franklin printed in Forbes Magazine. The depth of that popular publication's statistical analysis does not match that of Lipper.

company as opposed to a stock life insurance company." Tr. 402, 403. For those reasons, Johnson "totally reject[ed]" Livingstone's comparison of the expense ratio of the Vanguard Ginnie Mae Fund with the Franklin Ginnie Mae Fund. Tr. 403.

Defendants sought at trial to shore up that distinction by introducing a letter dated November 30, 1989 from a senior vice president of Lipper Analytical Services to Franklin Resources, commenting on the differences between the two funds. DX CA. The Court excluded the exhibit on defendants' case under the rules of evidence, but admitted the document when plaintiffs offered it, thereby transforming the letter into PX CA. Lipper's comments constitute something of a mixed bag. The letter concludes:

> The fundamental differences between the Vanguard Group and Franklin Resources makes a comparison between the Fund's managed by the two companies a tenuous one. In the world of mutual funds, Vanguard funds are truly unique.

However, the Lipper letter also indicates that Johnson was wrong in saying that the Vanguard GNMA fund received investment advice from a Vanguard manager at cost. The letter recites:

> The [Vanguard] GNMA Portfolio is managed by Wellington Management Company. In the fiscal year ended January 31, 1989 the GNMA portfolio paid 0.03% of its average net assets to Wellington. This extraordinarily low fee is possible because of the great buying power possessed by the Vanguard group. Acting on behalf of its shareholder constituency, The Vanguard Group has negotiated low advisory fees with Wellington, which manages the portfolios of fifteen Vanguard funds having assets of $16 billion at September 30, 1989, and twelve other money managers who oversee as many Vanguard fund portfolios. Note the advisors provide no other services beyond money management.

As to "other services", the Lipper letter states:

> The Vanguard Group reduces the costs of running mutual funds from the fund shareholders' point of view by operating on an "at-cost" basis. All the Vanguard mutual funds receive corporate management, administrative, shareholder accounting, marketing and distribution services from the Vanguard Group.

To that extent, Johnson's distinction is valid.

The conclusion to be drawn is that the Vanguard GNMA fund furnishes some basis for a comparison of performance with the Franklin Fund, but there are also significant differences in structure, peculiar to the Vanguard family of funds, which lessen the value of the comparison for purposes of this litigation.

(b) *The Profitability to Franklin of its Services to the Fund.*

In *Gartenberg I* the Second Circuit described the adviser-manager's "cost in providing the service" as a factor pertinent to the fairness of its fee, but did not specifically refer to "profitability." 694 F.2d at 930. In *Krinsk* the court listed "the profitability of the fund to the Adviser–Manager" as a significant factor, but did not specifically refer to costs. 875 F.2d at 409. In fact, profitability and costs are intertwined. In a presentation to the Fund's directors, Charles Johnson described "profitability" in terms of "net income as a percentage of revenues." DX X at p. 3. One arrives at net income by deducting appropriate costs from gross revenues. The parties dispute the propriety of certain cost deductions from Franklin Advisers' fees paid by the Fund. I deal with that issue *infra,* when considering whether Franklin misled the Fund's directors and whether the latter conscientiously performed their duties. But profitability may usefully be considered separately from those issues. As the Second Circuit observed in *Gartenberg I,* a fund's directors may be fully informed and endeavor to act conscientiously; nevertheless, "an adviser-manager's fee could be so disproportionately large as to amount to a breach of fiduciary duty in violation of § 36(b)." 694 F.2d at 930.

Coopers & Lybrand, the certified public accountants retained by Franklin Resources, prepared a report dated January 4, 1988 to the boards of directors of the Franklin group of mutual funds. PX 7, DX AG. That report undertook to prepare statements of revenue and expenses by function, and statements of profitability by fund, for the fiscal years ended September 30, 1985 and 1986 and for the six months ended March 31, 1987. Coopers & Lybrand did not conduct an examination made in accordance with generally accepted auditing standards of the financial information furnished to it by Franklin, and accordingly did not express an opinion on that information. Letter of December 30, 1987 forwarding report at 2. The report sets forth two sets of statements of revenue and expenses by function for each of the three time periods, each using a different indirect costs allocation methodology. "One method uses function related revenue factors as the basis for allocating indirect expenses by function, and the other uses function related direct labor factors as the basis for allocating indirect expenses by function." *Id.* at 1. Otherwise, the two sets of financial information used the same assumptions, definitions and methodologies for identifying or allocating revenue and expenses among the functional categories. Coopers and Lybrand stated in the letter accompanying its report:

> Based on the procedures included in our review, as indicated above, it appears that while other methods of allocation may be appropriate and could produce different results, the methods used by the Company [Franklin Resources] to identify or allocate revenue and expenses by function and fund in preparing the statements referred to above appear to be methodologies that are reasonable under the circumstances.

Using the method of indirect expenses allocated on the basis of revenue, the report shows profitability to Franklin Resources generated by the Fund for the fiscal years ending September 30, 1985 of

13.95%; for the fiscal year ending September 30, 1986 of 22.31%; and for the six months ending March 31, 1987, 30.44%.

Using the method of function related direct labor factors as the basis for allocating indirect expenses by function, the report calculates profitability for the fiscal year ending September 30, 1985 of 14.27%; for the fiscal year ending September 30, 1986, 22.52%; and for the six months ending March 31, 1987, 30.65.

Those profitability calculations depend upon a fully-distributed cost accounting set forth in the Coopers & Lybrand report. The accounting allocates indirect expenses incurred by Franklin Resources as among the following functions: "Underwriting," "Transfer Agent," "Management," and "Other."

We now come to a hotly disputed area. Plaintiffs claim that Franklin Resources misled the Fund's independent directors by misallocating expenses from its underwriting function to the management function, thereby artificially decreasing the legitimate profitability of the Fund to Franklin.[4]

Before considering the evidence on this issue, I must address defendants' standing objection to plaintiffs' "misallocation" claim as falling outside the scope of the issues for trial identified by the complaint and the pre-trial order.

As noted, the complaint alleged "in particular" a violation of § 36 of the Act. The pre-trial order provided in ¶ 1:

> The parties agree that the trial of this action shall be based upon this Final Pre–Trial Order and upon the pleadings. No claims or defenses are abandoned, and no claims or defenses other than those set forth in the pleadings and this Final Pre–Trial order may be asserted.

The parties thereupon set forth, *inter alia,* their respective proposed findings of fact and conclusions of law.

Previously defendants had taken the pre-trial deposition of plaintiffs' expert, Livingstone, and sought full disclosure of any

---

**4.** The phrase "legitimate profitability" refers to considerations prompted by § 12(b) of the Act and SEC Rule 12b–1, discussed *infra.*

opinions adverse to defendants that Livingstone might offer at trial.

Defendants objected to plaintiffs' misallocation of expense theory at trial, and evidence in support thereof, because they regard the claim essentially as one falling under § 12(b) of the Act, which defendants say was not pleaded in the complaint or embraced by the pre-trial order. Section 12(b) provides that:

> It shall be unlawful for any registered openend company (other than a company complying with the provisions of section 80a–10(d) of this title) to act as a distributor of securities of which it is the issuer, except through an underwriter, in contravention of such rules and regulations as the [SEC] may proscribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 80a–12(b).

The SEC has promulgated Rule 12b–1, 17 C.F.R. § 270.12b–1, which provides in subsection (a)(2):

> For purposes of this section, such a company will be deemed to be acting as a distributor of securities of which it is the issuer, other than through an underwriter, if it engages directly or indirectly in financing any activity which is primarily intended to result in the sale of shares issued by such company, including, but not necessarily limited to, advertising, compensation of underwriters, dealers, and sales personnel, the printing and mailing of prospectuses to other than current shareholders, and the printing and mailing of sales literature.

Rule 12b–1(b) further provides that a registered open-end management investment company may act as a distributor of securities of which it is the issuer if any payments made in connection with such distribution are made pursuant to a written plan conforming to the Rule. Franklin did not have a Rule 12b–1 plan; but the more general concern raised by plaintiffs at bar is that articulated by Judge Ward in *Schuyt* at 663 F.Supp. 987:

> Under Rule 12b–1, the directors had an obligation to assure themselves that there was not an indirect use of Fund assets for distribution expenses.

In *Gartenberg I*, Judge Pollack looked to § 12(b) of the Act and Rule 12b–1 to determine whether certain processing costs "are of the character of forbidden 'distribution' expenses," drawing the distinction in that regard between "managerial functions" and "promotional expenses." 528 F.Supp. at 1052.

I reject defendants' contention that plaintiffs at bar cannot appeal to § 12(b) principles because that section of the Act is not specifically pleaded in the complaint or referred to in the pretrial order. The independent directors' duty to prevent the indirect use of fund assets for distribution expenses, which may occur if "forbidden" distribution expenses are placed in the management column where they do not belong, forms an integral part of evaluating the fairness of the manager-adviser's fee, as *Schuyt* and *Gartenberg I* indicate. Indeed, in *Gartenberg I* Judge Pollack considered § 12(b) and Rule 12b–1 contentions within the context of plaintiffs' § 36(b) claim, while refusing plaintiffs' "diversionary belated attempt" to expand the issues so as to assert claims under §§ 15(a) and 20(a) of the Act. Judge Pollack rejected those claims because "[t]he complaints in these suits allege but one cause of action—a claim for breach of fiduciary duty under Section 36(b)," 528 F.Supp. at 1065. *See also* 694 F.2d at 933–34. Claims under those other sections fell outside the scope of the § 36(b) pleading, but § 12(b) considerations did not.

However, at the conclusion of Livingstone's direct testimony I granted defendants' motion to strike that testimony insofar as Livingstone undertook to describe specific instances of expense misallocation. I did so because Livingstone gave no such testimony at his deposition, although repeatedly pressed by defendants' counsel to reveal all opinions he then held favorable to plaintiffs and adverse to defendants on any issue in the case. Furthermore, plaintiff's proposed findings of fact do not deal with misallocations of expenses. Plaintiffs' only

specific reference to the cost study appears in Proposed Finding of Fact ¶ 35:

In 1987, Franklin undertook to make a cost study regarding the profitability of the Fund to Franklin. This was performed in consultation with Coopers & Lybrand, the regular auditors for Franklin as well as for the Fund. The cost study was finally completed and presented to the Board of directors of the Fund in early 1988. A discussion of the material contained in the report is set forth below.

The only discussion "set forth below" uses figures and percentages derived from the Coopers & Lybrand report, but there are no specific references to misallocations of expenses.

The purpose of a pre-trial deposition of the adverse party's expert witness is to learn in advance of trial precisely what the expert will say, in order to prepare to meet it. Similarly, proposed findings of fact in a pre-trial order are intended to identify those factual assertions which the adverse party will make, equally necessary for trial preparation. It would not have been fair, in these circumstances, to permit Livingstone to give detailed opinion testimony with respect to misallocation of expenses. But the general principles involved are sufficiently familiar from case law, and subsumed by plaintiff's § 36(b) claim, to permit me to consider the issue, to the extent that I comprehend it without the assistance of expert opinion testimony.

Plaintiffs base their charge of improper allocation of distribution expenses to the investment management function primarily upon a comparison between Franklin Resources' report to the Fund directors dated July 17, 1987 (PX 17), and the Coopers & Lybrand report dated January 4, 1988 (PX 7). The genesis of those reports and their consideration by the directors are considered *infra*. For present purposes it is sufficient to say that some rather startling differences between the two reports appear in the allocation of expenses among the several Franklin functions.

The July 17, 1987 report was prepared by Franklin staff over a period of months.

The report states that because the "cost and profit analysis is accounting oriented, the guidance and concurrence of Coopers & Lybrand was obtained on each significant step of development in the financial model." The report deals first with Franklin Resources as a whole, and then performs a product-line study of each fund with respect to revenues and expenses. The report analyzes "direct cost—compensation," and "indirect cost." The report also contains a condensed income statement for Franklin Resources, broken down between "underwriting," "transfer agent fee," "management," and "others."

Treating Franklin Resources as a whole, for fiscal year ended September 30, 1985 "management" produced investment management fees of $41,593,615 against total expenses allocated to management of $3,322,567. For the fiscal year ended September 30, 1986, those figures for "management" are $98,371,448 and $5,853,453. For the first six months ended March 31, 1987, the figures are $75,463,061 and $4,261,835. PX 17 at p. 9.

The total expenses allocated to the underwriting function for Franklin Resources as a whole were, for the fiscal year ended September 30, 1985, $18,524,853; for the fiscal year ended September 30, 1986, $39,516,822; and for the six months ended March 30, 1987, $20,107,401.

In succeeding pages, the report calculates "cost and profit results by function" with respect to each of the funds managed and advised by Franklin Resources. With respect to the Fund at issue, for fiscal year ending September 30, 1985 the report shows advisory fees of $17,670,249 against expenses allocated to the advisory function of $117,613; for the fiscal year ended September 30, 1986 the comparable figures are $50,999,954 and $336,054; and for the six months ending March 31, 1987 they are $33,942,407 and $579,724.

Those same pages of the July 17, 1987 report allocated to the Fund expenses for the underwriting function in the fiscal year ended September 30, 1985 which totalled $10,066,356; for fiscal year ending September 30, 1986, $21,383,791; and for the first

six months ending March 31, 1987, $8,477,-901.

Turning now to Coopers & Lybrand's January 4, 1988 report, PX 7, as noted the statements of revenue and expenses by function were computed by two methods in respect of the allocation of indirect expenses. The table below sets forth management revenues and expenses allocated to the management and underwriting functions of Franklin as a whole, first under that method using revenue factors to allocate indirect expenses, and then using direct labor factors to allocate indirect expenses:

Using Revenue Factors to
Allocate Indirect Expenses

FYE 9/30/85

| | |
|---|---|
| Management fees: | $41,763,501 |
| Management expenses: | 37,177,657 |
| Underwriting expenses: | 2,704,873 |

FYE 9/30/86

| | |
|---|---|
| Management fees: | 98,535,011 |
| Management expenses: | 75,727,036 |
| Underwriting expenses: | 5,859,417 |

Six Months ended 3/31/87

| | |
|---|---|
| Management fees: | 75,504,188 |
| Management expenses: | 45,478,190 |
| Underwriting expenses: | 3,726,230 |

Using Direct Labor Factors To Allocate
Indirect Expenses

The total for management fees and management fees and management expenses do not change. The total expenses allocated to the underwriting functions are:

| | |
|---|---|
| FYE 9/30/85: | $ 638,640 |
| FYE 9/30/86: | 1,382,661 |
| Six months ended 3/31/87: | 1,831,468 |

*See* PX 7 at pp. 3–8.

When the Coopers & Lybrand report turns to an analysis of each fund, the following figures appear with respect to the Fund at issue. For the fiscal year ended September 30, 1985, the report shows management revenue of $17,670,249; expenses allocated to the management function of $13,281,076; and expenses allocated to the underwriting function of $1,584,494. For the fiscal year ended September 30, 1986, the comparable figures are $50,999,-954, $28,466,552, and $3,189,605. For the six months ending March 31, 1987, the comparable figures are $33,942,407, $13,915,-550, and $1,478,972.

Between these two reports, there are dramatic decreases in underwriting expense and equally dramatic increases in management expenses. Which allocation of expenses is correct? Did Franklin Resources attempt to mislead the independent directors of the Fund by misallocating expenses? If it did so, were those independent watchdogs deliberately inattentive or carelessly asleep in their kennels? I consider these questions *infra*. For the present, I consider the effect of expense allocation upon profitability. It is necessary to quantify that effect, since the cases teach that an adviser's fee may be fair or unfair, whether or not particular expenses are deducted from the adviser's gross revenues. *See Krinsk*, 715 F.Supp. at 502 ("profitability to Merrill Lynch from fee based activity was well within the realm of reasonableness, even without downward adjustment for costs of financial consultants and sales assistance"); *Gartenberg I* at 528 F.Supp. 1052 ("The compensation accepted by the Adviser was not unfair whether viewed with or without consideration of the processing costs").

Defendants contend that, whatever the resolution of the other questions related to expense allocation, the whole issue makes no difference because its effect upon profitability is minimal. Defendants argue in substance that if Franklin Resources' purpose in switching expenses from the shell of underwriter function to that of management was to take the independent directors' eyes off the pea of profitability, the result was hardly worth the effort. Calculations of profitability derived from the July 17, 1987 report, pp. 10–12, give profitability figures of 17.65% for the fiscal year ended September 30, 1985, 25.72% for fiscal year ended September 30, 1986, and 32.53% for the six months ending March 31, 1987.[5] The January 8, 1988 report gives

---

**5.** For example, p. 10 of PX 17 lists net total income for the Fund for the fiscal year ending September 30, 1985 of $4,728,299 on total revenues of $26,774,095, or 17.6% profitability.

profitability figures for those periods using method A for allocating indirect expenses of 13.95%, 22.31% and 30.43%; and, using method B 14.27%, 22.52%, and 30.64%. PX 7 at pp. 25, 27. These differences are not as dramatic.

There is some force to this analysis, but it does not fully address the particular significance of proper allocation of distribution expenses in a section 36(b) claim, given the public policy concerns expressed in § 12(b) and Rule 12b–1. The Second Circuit in *Krinsk* approved Judge Walker's recognition that "[c]osts within the CMA program must be properly allocated in any profitability study lest the Fund subsidize the costs of Merrill Lynch's commission-generating activities." 875 F.2d at 410. Judge Ward in *Schuyt* approved directors viewing data on distribution expenses to monitor the adviser's performance, "just as long as they did not consider these expenses when they voted on the advisory agreement, lest they ignore the advice of counsel and improperly [give] the Adviser an excessive fee so that the Adviser could indirectly use Fund assets to promote the Fund." 663 F.Supp. at 987–88. The issue is not so much whether shifting certain items of expense from one function to another dramatically reduces profitability calculations, but whether the independent directors, in assessing the profitability of the Fund to Franklin Advisers, should have disregarded certain distribution expenses altogether in voting upon the latter's management fee.

But defendants approach the matter in a second way. They grant plaintiffs' point "and then some" (defendants' post-trial brief at 13) by adding the full amount of expenses for "advertising" and "promotion" allocated by the Coopers & Lybrand report to the management function for Franklin Resources *as a whole* to the net income of the Fund at issue *alone*, and

then recalculate profitability of the Fund to Franklin. Defendants net these expenses down by about 50% to reflect the after-tax effect. In fact, the figures appearing in the Coopers & Lybrand report imply a tax rate of 48.49%, as Livingstone recognized in his presentation, *e.g.*, PX 32A, p. 6. In the calculations which follow, I will add to the Fund's net revenues 51.51% of the expenses in question to show the post-tax effect of defendants' approach:

Fiscal year ended September 30, 1985: To net revenues of $3,505,511, add $2,756,-145 in after tax expenses (generated by pre-tax expenses of $4,990,340 for advertising and $373,948 for promotion), for a total of $6,268,656, or 25% of total revenues of $25,127,197.

For fiscal year ended September 20, 1986: To net revenues of $15,965,195, add $6,214,255 in after tax expenses (generated by pre-tax expenses of $11,731,228 for advertising and $332,945 for promotion), for a total of $22,179,450, or 31% of total gross revenues of $71,550,595.

For the six months ending March 31, 1987: To total net revenues of $13,973,434, add $3,384,324 in after tax expense (generated by pre-tax expenses of $6,367,601 for advertising and $202,627 for promotion), for a total of $17,357,758, or 37.8% of total gross revenues of $45,907,000.

These calculations are based upon method A of allocating indirect costs. I do not think it necessary to repeat the exercise using Method B.

As defendants point out in performing their own exercise, it is unreasonably favorable to plaintiffs to take the advertising and promotion expenses from Franklin Resources' services to all the funds and add them to the net revenues of this Fund only. The actual profitability percentages are in all likelihood significantly less than those resulting from the Court's calculations.[6]

Comparable calculations underlie the other profitability percentages in text.

**6.** The parties have other disputes with respect to cost allocation. Plaintiffs contend that printing costs and registration fees should be allocated to the underwriting function, rather than to the management function. That may be true in

part with respect to printing, but certain printed documents, such as annual and other periodic reports, are the responsibility of the Fund, not Franklin, under the management agreement. DX BN, BV. As for registration fees, they fell upon Franklin as manager in respect of the Fund's regulatory filings, DX BN, and are prop-

The most that can be said is that, as in other cases involving multi-product services by an adviser-manager, the Court is left "with the problem of uncertain profitability." *Schuyt* at 663 F.Supp. 978. *See also Krinsk* at 715 F.Supp. 489 ("At the outset, the Court recognizes the impossibility of arriving at an exact profitability figure.") But it is most unlikely that the profitability of this Fund to Franklin at any time exceeded 35%.

Dr. Livingstone regarded the profits the Fund generated for Franklin Advisers as excessive on two other bases, both of which I reject. Livingstone fashioned what he referred to as "yardsticks of profitability" based upon return on common equity, and net income as a percentage of revenues. He compared Franklin Resources' return on common equity with a compilation with large broker firms, money center banks, insurance firms, mutual fund sponsors, public broker-dealers, personal loan companies, diversified financial groups, major regional banks, and a compendium of companies taken from Business Week's "Top 1000." As for net income as a percentage of revenues, Livingstone compared Franklin Resources with large broker firms, public broker-dealers, and New York Stock Exchange member firms.

Livingstone's approach in this regard, having the virtue of simplicity if nothing else, is that Franklin just plain made too much money. That is not an acceptable approach. Under the cases, to the extent that comparisons are probative at all, a mutual fund adviser-manager must be compared with members of an appropriate universe: adviser-managers of similar funds. Plaintiffs offer precisely the sort of profitability analysis which Judge Sweet rejected in *Meyer v. Oppenheimer Management Corp.*, 715 F.Supp. at 576. Plaintiff in *Meyer* relied upon evidence that the profitability to the fund's investment adviser was higher than that of broker-dealers and ten large banks. Judge Sweet found that evidence of no assistance to him:

However, a return on assets or investment analysis adds little to the determination because a money market fund management company has no substantial net worth, is not capital intensive, and its activities differ from other types of financial services companies which provide services other than the management of money market funds from exclusive business funds.

*See also Gartenberg I* at 694 F.2d 930 n. 3:

Appellants' argument that the lower fees charged by investment advisers to large pension funds should be used as a criterion for determining fair advisory fees for money market funds must also be rejected. The nature and extent of the services required by each type of fund differ sharply. As the district court recognized, the pension fund does not face the myriad of daily purchases and redemptions throughout the nation which must be handled by the Fund, in which a purchaser may invest for only a few days.

In the case at bar, I give no weight to plaintiffs' comparisons of the Fund's profitability with a wide range of different sorts of companies, both within the broad boundaries of the "financial industry" and outside them.

### (c) *Economies of Scale.*

The concept of "economies of scale" assumes that as a mutual fund increases in size, its operational costs decrease proportionally. If a fund realizes economies of scale, its willingness to let the shareholders participate in the resulting benefits becomes a factor in evaluating the reasonableness of the adviser-manager's fees.

Section 36(b) of the Act was specifically directed to economies of scale. In *Fogel v. Chestnutt*, 668 F.2d 100, 111 (2d Cir.1981), *cert. denied*, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982), Judge Friendly wrote:

The problem to which § 36(b) was addressed was that with which the SEC had dealt in pages 125–49, 154 of its Report on Public Policy Implications of Invest-

---

erly characterized as expenses of management rather than distribution. *I need not address all of the disputes suggested by the record, since* there is no reason to think they would significantly alter the conclusions reached in text.

ment Company Growth (PPI), H.R.Rep. No. 2337, 89th Cong., 2d Sess. (1966). This was that advisers' fees, generally stated as a percentage of the market value of the managed assets, which had been altogether reasonable when a fund was launched, may have become unreasonably high when the fund grew to enormous size.

In *Gartenberg I* the Second Circuit looked again to legislative history:

> We do not suggest that rates charged by other adviser-managers to other similar funds are not a factor to be taken into account. Indeed, to the extent that other managers have tended "to reduce their effective charges as the fund grows in size," the Senate Committee noted that such a reduction represents "the best industry practice [which] will provide a guide," S.Rep. No. 91–184, *supra*, [1970] U.S.Code Cong. & Ad.News at 4902.
>
> 694 F.2d at 929.

Thus the Second Circuit recognizes as a factor bearing upon the reasonableness of fees "the extent to which the adviser-manger realizes economies of scale as the fund grows larger," *Gartenberg I* at 930. *Krinsk* lists "economies of scale" as one of the relevant factors. 875 F.2d at 409. The judges of this Court who have tried § 36(b) case have dealt with economies of scale: in *Gartenberg I* at 528 F.Supp. 1054–1055; in *Schuyt* at 663 F.Supp. 979–980 (and *see* 970 n. 25); and in *Krinsk* at 715 F.Supp. 496.

Plaintiffs in prior cases have argued in substance that since a fund increased dramatically in size, economies in scale must have been realized. The courts reject that argument. In *Krinsk*, Judge Walker accepted the proposition that "economies of scale 'relate to the costs incurred in doing a unit of something,'" and dismissed plaintiff's exhibits as unpersuasive because they "fail[ed] to demonstrate that the per unit cost of Fund transactions ... decreases as the number of units increases." 715 F.Supp. at 496. Judge Walker went on to find

> that merely because the ratio of fee based expenses to fee based revenues declined at a time when the Fund size

grew, that fact does not establish that such a decline was necessarily due to economies of scale.

*Ibid.*

Affirming the dismissal of the complaint in *Krinsk*, the Second Circuit quoted that language with approval at 875 F.2d 411, and went on to say:

> Rather, to show economies of scale, plaintiff bore the burden of proving that the per unit cost of performing Fund transactions decreased as the number of transactions increased.

*Ibid.*

For that proposition the Court of Appeals cited the district court's opinion in *Gartenberg I*, at 528 F.Supp. 1055, where Judge Pollack wrote:

> That processing costs do not significantly diminish as Fund assets increase accords with logic and common sense. While it may be almost as easy to invest a block of $100 million as a block of $10 million, it requires substantially more time, money and personnel to process 1 million shareholders than 100,000 orders. The ease and speed with which Fund shares can be bought or redeemed is crucial to the success of any money market fund, especially since the investor looses money for every minute his funds lie unemployed. Merrill Lynch added more than 3,000 non-sales personnel to handle the additional transaction volume caused by the Fund.

I conclude from these cases that to demonstrate breach of fiduciary duty in respect of economies of scale, an investor must first prove that in fact the fund realized economies of scale. This requires proof of decreasing costs on a per-unit basis, as the fund increases in size. In *Krinsk* Judge Walker accepted the testimony of a defense witness that one must "try to create a detailed analysis of each element of a transaction ..., over an extended period of time, over different levels of activity, to determine whether or not there are economies of scale." 715 F.Supp. at 496. While this was a defense witness, Judge Walker accepted his view, and the Second Circuit clearly bestowed its imprimatur of approv-

al in the language I have quoted from its opinion affirming *Krinsk.* To place that burden of proof upon a plaintiff accords with logic and common sense, as Judge Pollack observed in *Gartenberg I.* Economies of scale do not exist in a vacuum. The concept is meaningful only if increased size of a fund (more shareholders, more assets under management) directly reduces the manager's costs of processing each transaction and servicing each shareholder. A plaintiff must prove that the fund actually realized such economies of scale.

If a plaintiff makes that showing, then the question becomes whether the fund has permitted shareholders to participate, at least in part, in the economies of scale it has realized. In *Schuyt* Judge Ward quoted with approval counsel's advice to independent directors as to how a fund shares the benefits of economies of scale:

> The basic test is whether the directors can satisfy themselves that the information that is available provides a reasonable basis for judgment that the benefits of the economies of scale are in fact shared by the advisor with the Fund (*e.g.,* by appropriately fixed "break-points" or alternatively, by means of a fee structure which, whether or not containing break-points, in effect incorporates economies of scale by virtue of a relatively low starting point which in effect subsumes economies of scale throughout).

663 F.Supp. 970 n. 25.

*See also Gartenberg I* at 528 F.Supp. 1054 ("Clearly, the present schedule takes account of economies of scale; the rate of fees diminishes progressively.")

In the case at bar, as their expert Livingstone acknowledged, plaintiffs did not attempt a study to determine if the per-unit cost of each transaction for the Fund decreased as the number of transactions increased. Tr. 226. Rather, Livingstone offered two definitions of "economies of scale," and contended that charts drawn from the Coopers & Lybrand report of January 4, 1988, PX 7, demonstrate that Franklin actually realized economies of scale.

Livingstone began his definitions by testifying that "[e]conomies of scale are also sometimes referred to as 'increasing returns to scale.'" He then said:

> As the volume or scale of operations increases, then economies of scale or increasing returns to scale may arise from either (a), decreasing average cost per unit produced;
>
> (b), increasing average revenue per unit produced.
>
> In either case, the result is increasing profit per unit produced. Thus, economies of scale are evidenced by, (a), decreasing percentage cost to revenue as the volume of operations increases; or (b), increasing percentage of profit to revenue as the volume of operations increases.

Tr. 42.

Fixed costs, which do not increase with volume, give rise to economies of scale of type (a). Livingstone then said:

> Case (b), that is, the case of increasing percentage of profit to revenue, can occur even if all costs are perfectly variable. All that would be required is for average revenue per unit to increase with volume while average cost per unit remains constant. Then profit per unit rises.

Tr. 42–43.

Charts based upon the Cooper's & Lybrand report demonstrate that during fiscal years 1985, 1986, and 1987, Franklin's total expenses of operating the Fund declined relative to revenues. PX 32A, p. 2; Livingstone, Tr. 56. That is to say, although expenses were increasing, revenues were increasing at a faster rate. For example, total expenses of operating the Fund increased from $18,321,417 in fiscal year 1985 to $38,592,765 in 1976 (a 110% increase), while total Fund revenues increased from $25,127,197 to $71,550,595 (a 185% increase). A similar pattern may be observed with respect to the investment management component of expense during these years.

Livingstone also prepared charts, derived from statistics in the Coopers & Lybrand report, to show that the expenses of Frank-

lin as a whole per account and per million dollars of net asset value declined over this period of time.

Plaintiffs infer from all these circumstances that "Franklin's per unit cost of performing Fund transactions did decline as the Fund grew in size." Post-trial brief at 9.

These statistics, although charted accurately by Livingstone, are not sufficient to carry plaintiffs' burden of proving the realization of economies of scale. Livingstone's alternative definition of economies of scale as "increasing average revenue per unit produced" finds no support in the cases construing § 36(b). As for the declining ratio of expenses to revenues at a time of increasing size, Judge Walker squarely held in *Krinsk* that economies of scale could not necessarily be inferred from those circumstances, and the Second Circuit affirmed him on the point, adding its own analysis of what a plaintiff had to prove.

As for the declining expenses per account and per million dollars of net asset value, the Coopers & Lybrand report shows that trend, *see* PX 7 p. 32. But the same page contains statistics more relevant to the per-transaction analysis required by the test articulated in *Krinsk*. On page 32 of its report, Coopers & Lybrand computed "comparative expenses" with respect to a number of benchmarks: "per $1,000,000 NAV [net asset value]," "per shareholder," "per new account," "per redeemed account," and last (but certainly not least in relevance) "per transaction." Three categories of expense are listed: "variable—compensation," "variable—others," and "fixed." With respect to expenses "per transaction," each of those three categories increased between fiscal year 1985 to fiscal year 1986, and again in the first six months of fiscal year 1987. For those three periods of time, the total expenses "per transaction" go from 11 to 16 to 21.

This study embraces all funds serviced by Franklin Resources. Accordingly it falls short of analyzing what was actually taking place in respect of Franklin's services to the Fund in suit. That is more of a problem for plaintiffs than defendants, since this case involves only the government securities fund, and plaintiffs bear the burden of proof on the issue. But it is fair to say that to the extent Franklin family-wide statistics are probative, the statistics relating to comparative costs per transaction conform more closely to the court of appeals' approach in *Krinsk;* and those statistics militate against a finding of realization of economies of scale, rather than in favor of it.

The record contains evidence to explain why that is so. Kingman, defendants' expert, testified in his deposition:

> [t]he management of Ginnie Mae securities involves a lot more costs than in managing other kinds of securities, and the costs continue to grow as the volume of the securities managed increases. Therefore, you have less economy of scale than you would in managing stocks or bonds.

Dep. at 23–24.

As noted at pp. 1228–29, *supra* as the fund increased in size, Franklin increased staff to keep up with the making of manual entries.

There is also evidence to suggest that to the extent economies of scale were realized by Franklin, they were passed on to some degree to shareholders. The fee scale had break-points keyed to size from the beginning, and in January 1988 the independent directors required that an additional break-point be fashioned. The effective fee rate of the Fund shows a declining trend, as follows:

| FYE | At Then Current Size |
|---|---|
| September 30, 1984 | .509% |
| September 30, 1985 | .453% |
| September 30, 1986 | .452% |
| September 30, 1987 | .452% |
| September 30, 1988 | .450% |

The expense ratio also showed a generally downward trend; *see* pp. 1226–27, *supra*.

Judge Ward observed in *Schuyt*, 663 F.Supp. at 979, that with respect to economies of scale, "it is appropriate to consider

fee schedules in the money market industry." Here the Fund does not fare so well. DX AA, the Lipper report analyzing the Fund's performance for fiscal year 1986, places Fund eighth out of 13 in effective fee rates. DX BF, the 1989 Lipper update, places the Fund twelfth in a peer group of 15.

These rankings would suggest that the fees paid by the Fund to Franklin were not set so low from the beginning as to subsume economies of scale throughout, that being one of the methods of making the benefits available to shareholders identified by Judge Ward. To that extent, the Fund's relative rankings with respect to effective fee rates run counter to the much more impressive rankings on expense ratios, and the declining rates demonstrated both on expense ratios and effective fee rates.

However, the question of distribution to shareholders of the benefits of economies of scale does not arise unless plaintiff prove that economies of scale were in fact realized. They have not made the particular showing required by *Krinsk;* and the evidence in the record on economies of scale is at best inconclusive. Plaintiffs bearing the burden of proof on the issue, they can take no comfort from economies of scale in the case at bar.

(d) *The Role Played By The Fund's Independent Directors.*

"The expertise of the [independent directors], whether they are fully informed, and the extent of care and conscientiousness with which they perform their duties are among the most important factors to be examined in evaluating the reasonableness of compensation under section 36(b)." *Krinsk* at 875 F.2 412, citing *Gartenberg I,* 694 F.2d at 930. Congress designed the Act to place the unaffiliated directors in the role of "independent watchdogs." "In short, the structure and purpose of the [Investment Company Act] indicate that Congress entrusted to the independent directors of investment companies, exercising the authority granted to them by state law, the primary responsibility for looking after the interest of the fund's shareholders." *Burks v. Lasker,* 441 U.S. 471, 484–85, 99 S.Ct. 1831, 1840–41, 60 L.Ed.2d 404 (1979) (footnote omitted).

The Fund had five directors, of whom three were independent: Kerr, Ashton, and Fortunato. I consider separately the expertise of the independent directors, the extent to which they were informed about all facts bearing on the adviser-manager's services and fee, and the care and the conscientiousness with which they performed their duties.

(1) *Expertise.* Edmund H. Kerr graduated from Stanford Law School in 1951, where he was managing editor of the Law Review. He than joined the New York law firm of Cleary, Gottlieb, Friendly and Cox (now Cleary, Gottlieb, Steen & Hamilton). Kerr is presently the senior fully active partner in the firm. He has specialized in the practice of securities laws, federal and state. He has twice served as court-appointed counsel to interim boards of directors appointed as the result of SEC proceedings alleging violations of the Investment Company Act. He has been a director of funds in the Franklin Group for 27 years.

Harris J. Ashton graduated from Columbia Law School in 1959. He practiced law with two New York firms until he left the full-time practice of law in December 1967 to become the president of General Host Corporation. Ashton had been the outside director and general counsel of that company and was asked to become president by the chief executive officer when his predecessor was discharged. Ashton is currently the chairman of the board, president and chief executive officer of General Host Corporation. He is also a director of Royal Bank and Trust Company and RBC Holdings (U.S.A.) Inc. Ashton became a director of the Fund in approximately 1961.

S. Joseph Fortunato graduated from Harvard Law School in 1957. Following graduation he joined the Newark, New Jersey law firm of Pitney, Hardin, Kipp & Szuch and has remained there ever since, currently serving as one of four members of the management committee. In recent

years Fortunato has specialized in employment law, including labor negotiations and litigation. Fortunato has served on the ethics committee and the client security funds committee of his local bar association. He became a director of a number of Franklin Funds in about 1982.

The education and professional experience of the independent directors more than adequately equipped them to discharge their fiduciary responsibilities as directors of the Fund.

(2) *The Extent to Which the Independent Directors were Informed.* One of the independent directors' "special responsibilities" is "the duty to review and approve the contracts of the investment adviser and principal underwriter," *Burks v. Lasker, supra,* at 483, 99 S.Ct. at 1840. To perform that function, the directors must be "fully informed about all facts bearing on the adviser-manager's service and fee," *Gartenberg I,* 694 F.2d at 930. Plaintiffs contend that the independent directors were not well informed. They charge Franklin misled those directors "by furnishing them with a revised cost analysis which improperly allocated distribution expenses to the investment management function." Post–Trial Brief at 1. Specifically, plaintiffs allege that the January, 1988 Coopers & Lybrand report to the directors "is demonstrably and materially erroneous and misleading," whereas the July 1987 report prepared by Franklin Resources "accurately portrays investment management profitability. The difference between the two resulted from the allocation of distribution costs to investment management." *Id.* at 6.

In addition to the specific charges arising out of the comparison of these two reports, plaintiffs also contend that throughout the pertinent period, Charles Johnson misled the independent directors by falsely stating to them that expenses were increasing proportionately with increasing size and volume, whereas in fact they were not.

An important element of the independent director's informed state is the advice they received from their independent counsel. That role was played in the case at bar by Brian Lorenz, Esq. Lorenz is a member of the New York firm of Carro, Spanbock, Kaster & Cuiffo. He is a 1963 graduate of Harvard Law School. Defendants refer to Lorenz as "independent counsel", Proposed Finding of Fact 18. Plaintiffs say that the independent directors did not have "separate, independent counsel but relied instead upon counsel to the Fund, Brian Lorenz." Proposed Finding of Fact 29. That assertion reflects the undisputed fact that Lorenz has served as secretary to the Fund since its inception. He appeared as trial counsel for Fund, although he took no active part.

Lorenz' affiliation with the Fund may be considered in assessing the quality of his advice, but does not disqualify him automatically from performing the important function of counsel to the independent directors. *Compare Schuyt* at 663 F.Supp. 965 ("During all relevant times, the independent directors of Prime Reserve Fund had their own counsel, Stanley J. Friedman.... Friedman had been counsel to Prime Reserve Fund since the Fund was organized in 1975.")

Plaintiffs contend that the Fund paid excessive fees to Franklin Advisers during the fiscal years ending on September 30, 1987 and September 30, 1988. Franklin Advisers rendered services to the Fund during those two fiscal years pursuant to three management agreements: the February 1986—February 1987 agreement, the February 1987—February 1988 agreement, and the February 1988—February 1989 agreement.

On November 5, 1985 the directors met at the Cleary, Gottlieb offices to consider, *inter alia,* the management and the distribution contracts with Franklin Distributors (then acting as the investment adviser to the Fund). All five directors attended, as did Lorenz. The minutes of that meeting, DX A1, state that prior to the meeting the directors had been furnished with information concerning "the comparative performance and expense ratio of each Series to funds with comparable objectives, and analysis of the fees and expenses paid by the Fund for each Series during the past

five fiscal years, as well as information on Franklin Distributors and it personnel."[7] In point of fact, prior to the meeting Lorenz had sent a memorandum dated November 1, 1985 to the three independent directors, with copies to Charles and Rupert Johnson, stating: "I believe that attention must be given by you to the substantial growth in the U.S. Government Securities Series, whose assets now exceed $7 billion." Lorenz did not suggest that this growth "necessarily requires the lowering of the fee paid Distributors," but cautioned the directors to take that fact into account, and added that Distributors was "under an obligation to furnish you information on the effect of such growth insofar as it benefits shareholders through decreased per share expenses and improved services, as well as its general contribution to Distributor's profits." DX F. To ensure their continuing legal education, Lorenz sent the independent directors copies of the Second Circuit's decision in *Gartenberg I.*

At the November 6, 1985 meeting the independent directors queried Charles and Rupert Johnson on these matters. Consideration of the contracts was than put over to the next directors' meeting.

That meeting took place at the Fund offices in New York on December 6, 1985. All three independent directors attended, as did Charles Johnson. Rupert Johnson did not attend. Lorenz was present. The minutes reflect that the directors considered "costs and expenses of Distributors and other factors deemed relevant," and after discussion agreed to continue the management fee rate applicable to the Fund without change for another year. DX A.[8]

The board of directors met on November 14, 1986 to consider, among other subjects, the renewal of the management agreement between the Fund and Franklin Advisers (the successor to Franklin Distributors as adviser-manager) for another year. Prior to that meeting, Lorenz sent the independent directors another copy of his November 1, 1985 memorandum, stating that "the same considerations apply in connection with the review scheduled for November 14, 1986." DX F. Charles Johnson sent the independent directors a "position paper" dated November 12, 1986 arguing that the advisory fee arrangement should not be changed. He argued that fees charged by Franklin were "approximately mid-range" with those charged by comparable funds, which had higher expense ratios than Franklin. Johnson also stated: "Fees of Franklin and it affiliates appear to fluctuate in approximate correlation with costs. This observation is based on our experience," which Johnson explained in part by stating that: "Growth in net assets has a close parallel in growth in operating costs and number of employees." DX H.

The directors were furnished in advance of the meeting with a voluminous agenda book, DX J, giving financial statements of Franklin entities, performance comparisons with other funds, and statements of fund expenses and expense ratios.

The independent directors put certain question to Charles Johnson and then agreed that consideration of the management contracts would be considered at the next meeting. Minutes, DX I. That meeting was held on December 4, 1986 at the Cleary, Gottlieb offices. The minutes of that meeting, DX L, reflect that all five directors and Lorenz attended. The directors continued their review of the management and distribution agreements, "with particular consideration being given to whether a reduction in the management fees for the U.S. Government Securities Series should be made in view of the substantial growth of assets in that series." The independent directors questioned Charles and Rupert Johnson on a number of subjects, including the "profitability of the Fund to Franklin currently and histori-

---

**7.** These five directors sat on the board of Franklin Custodian Funds, Inc. The government securities Fund at issue is one of the five "series" comprising Franklin Custodian Funds, Inc. These directors were in effect the directors of the Fund, and are so characterized throughout this opinion.

**8.** The several board minutes are also in the record as plaintiffs' exhibits.

cally." After the discussion, the directors voted to renew the management contract with Franklin Advisers for another year. But they also decided to initiate "a study of all the services provided to the Fund by Franklin Resources and its subsidiaries." The notation of that decision in the minutes is preceded by reference to the directors having read the decisions of the district court and court of appeals in *Gartenberg I.* Lorenz was instructed to report to the board on the formulation and implementation of such a study.

The ultimate result of that direction, that a products-line study be prepared, is the Coopers & Lybrand report dated January 4, 1988. As noted, that report showed that during the pertinent times, the Fund's expenses were increasing at a lower rate than revenues. Those statistics cast some doubt upon the accuracy of Charles Johnson's statement to the board in November 1986 that the "fees of Franklin and its affiliates appear to fluctuate in approximate correlation with costs." But this record does not support the conclusion that when he said that, Johnson was deliberately trying to mislead the independent directors. A relatively precise correlation of costs to revenues with respect to a particular fund requires product-line analysis, which was not available to Franklin in November 1986, although the directors at the December 1986 meeting set events in motion which resulted in such a study. Johnson was not without a logical basis for believing that Franklin's costs increased with the size of the fund, given the increased hiring that had taken place and Franklin's moving to a new building with expanded space, which was planned in 1986 and occurred in 1987. Johnson dep. at 104.

In a series of communications and meetings involving Lorenz and the independent directors, it was agreed in principle that Coopers & Lybrand, the Fund's regular accountants, would conduct the requested study. In a proposal letter dated April 20, 1987 to the boards of directors of the several Franklin funds, DX R1, the accountants expressed their understanding that "the Fund's Boards would like to receive a more formalized study and analysis of informa-tion ..., with primary emphasis on the fees charged to the various Funds by Franklin, the nature and extent of services provided by Franklin to the Funds, and the costs incurred that could be allocated by Franklin in connection with providing such services." Coopers & Lybrand stated that the initial study and analysis of the fees charged and related costs to be allocated against them would be prepared by Franklin, with the accountants' role being "to appropriately examine and or review the study and analysis report prepared by Franklin, and to provide the Funds' Boards with a report providing our finding and conclusions."

On July 17, 1987, the board of directors met in Foster City, California. All five directors attended, as did Lorenz and representatives of Coopers & Lybrand and of the accounting and financial departments of Franklin Resources. Franklin's report of July 17, 1987, PX 17, DX Y, was furnished to the directors either shortly before or at the meeting. In either event, the directors did not have much time to consider the contents of the report, a lengthy one, before the topic came up for discussion at the meeting. The minutes of the meeting, DX Z, state that consideration was given "to discussions of a preliminary report prepared by Resources containing an analysis of its costs and profits, together with related performance statistics and other information." A Franklin Resources accounting officer, Domingues, undertook to explain to the directors the methodology and the assumptions underlying the report. Those were discussed, with the participation of the Coopers & Lybrand representatives. At the end of the discussion, according to the minutes, the directors agreed that "the information set forth in the preliminary report would be further refined and expanded by Resources with allocation and cost assumptions reviewed and approved as to reasonableness by Coopers & Lybrand." It was further agreed "that additional information, particularly Resource's fixed and variable costs, would be developed."

At the July 17, 1987 meeting the directors also made reference to Judge

Ward's opinion in the *Schuyt* case, copies of which Lorenz had sent to the directors with a memorandum dated July 13, 1987. DX W. Lorenz called the directors' particular attention to the court's discussion of analyzing the adviser-manager's costs.

On November 4, 1987 the directors met in New York, with consideration of the management agreements on the agenda. The directors had received another compendium of material from Franklin, but the cost analysis and study of Franklin's services was not yet at hand from Coopers & Lybrand, and so the consideration of the management contracts was deferred until the next board meeting, scheduled for December 4, 1987. All the directors and Lorenz attended the November 4, 1987 meeting. DX AE.

Under date of December 2, 1987, Coopers & Lybrand forwarded to the directors a report marked "draft copy" regarding "Profitability by Fund and Related Performance Information." DX AF. That draft report contained the same allocation of expenses as between the underwriting and the management functions that appear in the January 8, 1988 final report, PX 7, DX AK, which plaintiffs' brand as painting a false picture, in contrast to the July 17, 1987 report.

The directors met again in New York on December 4, 1987. Kerr was ill and did not attend. The other four directors attended, as did Lorenz. The minutes, DX AH, reflect that the directors reviewed and discussed Coopers & Lybrand's December 2, 1987 draft report. The directors understood that this draft "was in substantially final form subject to any comments of the directors"; they requested Lorenz to convey certain suggestions to Coopers & Lybrand and to Franklin Resources, and the independent directors decided to meet separately with representatives of the accountants and Franklin Resources to discuss the report prior to the next board meeting.

The directors were also in possession at the December 4, 1987 meeting of a written presentation forwarded by Charles Johnson, arguing that the existing fee arrangement under the management contract was reasonable and should not be changed.

The board deferred acting upon renewal of the management contracts until the next meeting.

On January 4, 1988 Coopers & Lybrand distributed its final report to the directors. That report contained a recitation by the accountants, as the two prior versions had not, that the method used by Franklin "to identify or allocate revenue and expenses by function and fund in preparing the statements referred to above appear to be methodologies that are reasonable under the circumstances."

On January 7, 1988 Ashton and Fortunato met privately with Lorenz and reviewed the Coopers & Lybrand report. Domingues and Campbell, two Franklin Resources accounting officers, were also brought into the discussions at times. Kerr could not participate because he was still ill. The action the independent directors took at the conclusion of this January 7 meeting is considered under the next heading. For present purposes, it is pertinent to note that during the January 7 meeting, the independent directors put questions to the Franklin Resources people as to "how certain expenses were allocated," Fortunato Tr. 381, and Domingues responded to those questions in a letter to Lorenz dated January 11, 1988. DX AL. That letter begins with this paragraph:

> In accordance with your request, and that of the Board of Directors at the Special Meeting of January 7, 1988, this letter outlines the rationale employed by Franklin Resources Inc., in selecting the approach taken in the cost and profit analysis recently completed and dated January 4, 1988. Additionally, we have included an estimate of the effect on profitability regarding the U.S. Government series fund if alternative allocation methodology would be applied to the following expenses: FEC broker relations, the Trading Department, and Advertising.

In depositions and at trial the three independent directors expressed satisfaction with the amount of information furnished

to them by Franklin. It is easy enough to understand why. The directors were given a great deal of material by Franklin in preparation for the meetings at which the management contacts would be considered. In addition, Franklin devoted considerable effort to the product-line cost and revenue study, once the independent directors requested that such a study be made. As for Lorenz, there is no basis in the record for questioning the independence or professionalism of his advice to Kerr, Ashton and Fortunato. Indeed, the direction that the costs and revenue study be made can be traced directly to Lorenz' calling the *Gartenberg* and *Schuyt* decisions to the independent directors' attention, and making entirely appropriate cautionary suggestions with respect to them.

Plaintiffs quarrel not so much with the quantity of the information given to the independent directors as with its quality. The charge is that Franklin misled the directors by the misallocation of expenses.

Were expenses misallocated from underwriting to management? The issue is certainly one of substance. Counsel for defendants argued in summation that since Coopers & Lybrand had pronounced Franklin's methodology of revenue and expenses allocation to be "reasonable," the Court should not set itself up as "a super-accountant." Tr. 531. I have no such ambition, but some of the expense allocations are puzzling. In *Gartenberg I* Judge Pollack looked to Rule 12b–1, which defines acting as a distributor of securities in terms of "financing any activity which is primarily intended to result in the sale of shares issued by such company." In that context, Judge Pollack drew the sensible distinction between "managerial functions" and "promotional expenses." 528 F.Supp. at 1052. The Coopers & Lybrand report lists "promotional costs" under the "management" function. If there is a difference between "promotional expenses" and "promotional costs" I do not know what it is, and do not see how either can be characterized as "managerial functions"

under the statutory and regulatory scheme. Much the same may be said of advertising expenses, which were also allocated to the management function in the Coopers & Lybrand report.[9]

Defendants explain the discrepancies between the July 1987 and January 1988 analyses on the basis that Franklin Distributors had been succeeded by Franklin Advisers as the adviser-manager (although retaining other responsibilities), and there had been a lag in the accounting department's internal allocation of such expenses as between those two Franklin entities. That changing of the guard may have caused some initial dislocations in accounting, but I agree with plaintiffs that given the chronology, those circumstances do not furnish a complete answer.

But it does not follow that Franklin affirmatively misled the independent directors. Applying traditional fraud analysis, one misleads another by false statements or the omission of material, true statements. Plaintiffs do not brand Franklin's July 17, 1987 report to the directors as false. On the contrary: plaintiffs say that this was an accurate allocation of expenses and revenues, worthy of all to be received. If Franklin's purpose was to build up management expenses for the purpose of reducing management profitability in the eyes of the independent directors, this was a doubtful overt act in furtherance of the conspiracy.

An alternative theory of misleading, also suggested in plaintiffs' argument, is that the July 1987 report took even Franklin by the surprise in its delineation of management function profitability. The cat of profitability was out of the bag, scratching and clawing, and Franklin, anxious to avoid any reduction in its fee scale, was determined to get the cat back into the bag. Hence the reallocation (or, plaintiffs would say, misallocation) of expenses in the January 1988 report.

---

**9.** The later allocations also make the underwriting function show handsome profits, not what one would expect from Charles Johnson's trial testimony: "The underwriting function is not a function that is operated for profit." Tr. 466.

The obstacle to a finding that Franklin misled the independent directors lies in the fact that the directors knew everything. They had observed the cat, such as it was, as the result of the delivery to them of the July 1987 report. In December 1987 they received the Coopers & Lybrand draft report with the reallocated expenses. The independent directors were capable to comparing the two reports and asking further questions. Indeed, at the January 7, 1988 meeting between two of the independent directors, counseled by Lorenz, and representatives of Franklin, follow-up questions were put to the Franklin people with respect to Franklin's "rationale" in its cost and profit analysis, and Franklin furnished answers in writing.

In short, if the directors were misled in any material fashion, it was not through Franklin's failure or refusal to make the directors aware of the information, statistics and analyses upon which the adviser-manager relied in fee negotiations. Nor is there a basis in this record for finding that Franklin acted in bad faith in submitting this data to the independent directors, under the supervision of respected independent accountants.

The focus therefore shifts to the conscientiousness and care with which the independent directors acted in the light of the considerable quantity of information available to them.

(3) *The Performance of the Independent Directors' Duties.* Plaintiffs' attack upon the independent directors' performance is based in part upon circumstances of association from which I am asked to infer a breach of fiduciary duty. Counsel observed in summation that "Mr. Ashton, Mr. Fortunato and Mr. [Charles] Johnson all played football together back in college," and that Johnson "sits on the board of General Host [Corporation]," which Ashton heads, thereby enjoying a position of "leverage over Mr. Ashton." Tr. 592. Plaintiffs do not connect these past or present associations to any particular act

or omission on the part of Ashton or Fortunato; the suggestion hangs suspended, as a high, deep punt leaves the football suspended against the brilliant vault of an October sky. But parties are entitled to prove any circumstances from which bias or other relevant states of mind might reasonably be inferred. I give these associations such weight as I think right, noting at the same time that Kerr, the most senior independent director in professional experience, did not share them. Kerr expressed the view at trial that the independent directors performed their functions "as conscientiously as they could have," and that he never observed evidence "of partiality generated out of friendship or the like that influenced the decisions and consideration of the issues before them of the independent directors. I saw nothing that indicated any such partiality." Tr. 281.[10]

On January 7, 1988, after dismissing the Franklin Resources representatives, Ashton, Fortunato and Lorenz continued their discussion over lunch. Ashton and Fortunato concluded that the independent directors should request Franklin to reduce the management fee charged to the Fund. Lorenz was told to convey to Charles Johnson the proposal that the existing two break-points be eliminated, that the fee start at .45%, and that a new break-point be imposed if the net assets of the Fund exceeded $15 billion. Lorenz relayed that proposal to Charles Johnson, who rejected it. Johnson spoke by telephone to Ashton and Fortunato and tried to persuade them that there be no reduction in the management fee. To Fortunato, Johnson stressed the first-rate organization Franklin had built, its positioning in the market place, and the increases in expenses through additional staff; "the number of people that they had at one point in time might have been like under 400 or 500, it was up to, say, 1700." Fortunato, Tr. 391.

The board of directors met again on January 13, 1988. Kerr was absent. The other four directors attended, together with

---

**10.** Plaintiffs objected to that testimony, but defendants offered it to meet an issue raised by plaintiffs. Kerr's own status as an independent director goes to the weight of his views, not their admissibility. On that score, I found him a credible witness.

Lorenz. Charles Johnson repeated his argument that Franklin's fees were not excessive, and there should be no reduction. Fortunato responded that the independent directors were not saying that Franklin charged excessive fees; "I don't have a basis for saying it; but that the size of the Fund is growing, and we want a reduction, and we believe that you should accept a reduction." Tr. 392. The affiliated and independent directors caucused separately. The discussion then resumed, with agreement being reached on the modifications in the fee from .45% to .44% on net assets in excess of $10 billion up to $12.5 billion; .42% on assets in excess of $12.5 billion up to $15 billion; and .40% on net assets in excess of $15 billion. After shareholder ratification, the new fee scale became effective on April 30, 1988.

Did the independent directors perform their duties conscientiously and with care? With respect to the first two management agreements at issue, there is no reason to find that they did not, unless one assumes that Franklin's fees had become so excessive that the directors should have pushed for a reduction earlier than they did. I cannot reach that conclusion on this evidence. The Fund had increased greatly in size, and with that increase revenues had increased; but the directors were aware of increasing costs (personnel, the new building), although a product-line analysis had not yet been done. The directors were also entitled to consider the high yield and low expense ratio of the Fund in relation to other comparable funds, as offsetting a fee rate which, while not the highest, was not one of the industry leaders from investors' point of view.

Nor did the independent directors remain passive in the face of the Fund's size and increasing revenues. Prompted by their counsel, Lorenz, and decisions emanating from this Court and the Second Circuit, the directors required that a product-line analysis of costs and revenues be prepared, and (again counseled by Lorenz) selected Coopers & Lybrand to preside over that study.

I cannot conclude that the independent directors breached or were inattentive to their duties in their reaction to the July 1987 and January 1988 reports. Plaintiffs claim in substance that the July 1987 report, in its allocation of expenses, was the true gospel and should immediately have been recognized by everyone as such. But it is clear from the evidence that no one regarded that report as a final one. The minutes of the July 17, 1987 meeting characterize the report as "preliminary," which of course it was. The directors had commissioned a report from Coopers & Lybrand, with the financial information to be gathered in the first instance by Franklin. What the directors received at the July 17, 1987 meeting represented the first stage of the project, although even there, as the minutes reflect, the report was sent back to Franklin for additional work. What the independent directors had bargained for, were waiting for, and eventually relied upon was the Coopers & Lybrand report, a draft of which reached them on or about December 2, 1987, to be replaced by the final report (unchanged in any material manner) on January 4, 1988.

Coopers & Lybrand characterized Franklin's expense and revenue allocations as "reasonable under the circumstances." There is neither suggestion in argument nor proof in the record that Coopers & Lybrand was anything other than independent, or that these formidable accountants did not conduct careful examinations of Franklin's worksheets. I have been prompted, looking through the powerful microscope of litigation and listening to the arguments of able counsel, to express some doubts about the cost allocation; but the independent directors, who bore the responsibility of decision, placed upon Coopers & Lybrand's certification of reasonableness a wholly justified reliance.

Even then, the directors did not passively accept the Coopers & Lybrand report. The independent directors studied it, and in their private meeting with Lorenz on January 7, 1988 summoned Franklin Resources employees and put further questions to them. Those questions were prompted by the directors' continuing concern with expense allocation. Indeed, Fortunato, who

appeared before me and whose testimony I credit, recalled that Ashton

> zeroed in almost immediately on advertising expenses and did not believe that that should be allocated the way it was. I think it was allocated on the basis of revenue with respect to the profitability—as an expense on revenue with respect to U.S. Government Fund from an accounting point of view, and Mr. Ashton had questioned that. And then he figured out what it would be with respect to profitability doing it either way.

In the event, the independent directors achieved a fee reduction in the form of additional break-points on net assets in excess of $10 billion. Plaintiffs say correctly that in practice the reduction does not amount to very much money, at least at present asset levels. But the Johnsons vigorously resisted any reduction in principle. Ashton and Fortunato pressed the demand for a reduction, but compromised on its amount, because they were persuaded that the Fund's increased size required a reduction, but did not wish to compromise the Fund's quality of service, shown by all the evidence to be outstanding. Fortunato testified on cross-examination:

> Q. What did you think that you were accomplishing by asking for $250,000 reduction?
> A. I think basically what we were accomplishing is that we were keeping an organization intact with an impact but nothing which in any way could be said to hurt the stability of the organization. OK?
> What we were doing, however, is indicating that the fund, because of its size we wanted a reduction, and established in the sense that the principle with respect to the check point it was establishing somewhat of a principle that almost by reason of the size alone, without anything else, in a [sic] we would be looking for reduction.

Ashton described the January 13, 1988 meeting:

> Q. Tell me what was said and by whom.
> A. Well, we were saying that we felt that this would be a fair rate going for-

ward in the future. They felt that as set forth in their memorandum that the rates were reasonable. We agreed they were reasonable with them and that as a practical matter that we just felt we would negotiate to see if we could get a reduced rate from them; and we felt we negotiated to the extent that we could. I would not have wanted to see it come to a situation where we would jeopardize the services that we were receiving; and so that was a negotiated transaction.

> Q. Did you calculate at the time how much the fee would be reduced?
> A. Yes, we did. We were more interested in reducing the fee if the fund went up again. As you were well aware, the fund has been going down. But, in a fixed income type investment, the environment could change and you could get an influx of money again.

I conclude that the independent directors performed their responsibilities in a conscientious and careful manner. There is no evidence that Ashton or Fortunato breached their fiduciary duties to Fund shareholders to accommodate Charles Johnson, out of misguided findings or (in Ashton's case) intimidation, and I find they did not do so. I rely in part on Fortunato's demeanor at trial,[11] and on the testimony of Kerr, quoted *supra.*

(e) *Comparative Rates.*

This factor, the last and least probative of those bearing upon the fairness of an adviser-manager's fee, has been referred to in the preceding discussion. Franklin's fee rate was towards the higher end of the scale among comparable funds. However, in respect of total yield and cost ratio, Franklin placed among the industry leaders.

## CONCLUSION

■ A main thrust of plaintiffs' case is that Franklin simply made too much money managing the Fund. However, in *Krinsk* the Second Circuit squarely rejected a Calvinistic condemnation of joy through profit:

> Krinsk further suggests that "excessive profitability alone should suffice to sup-

---

11. Ashton testified by deposition.

port a finding of unreasonableness." He cites to no case in support of this proposition, however, and in fact courts "must look to *all* the costs and benefits associated with the Fund," *Gartenberg v. Merrill Lynch Asset Management, Inc.,* 740 F.2d 190, 194 (2d Cir.1984) (*"Gartenberg II"*). 875 F.2d at 410 (emphasis in original).

Consideration of the relevant factors leads the Court to the conclusion that Franklin's fees were reasonable.

Franklin has made available complex and varied services of high quality to the Fund's shareholders, who have benefited from some of the highest yields and lowest expense ratios in the mutual fund industry. The Vanguard comparison is seriously flawed. Disregard it, and Franklin's fund is at the top of the yield chart. That performance, compiled with a low expense ratio, argues powerfully in support of the fees.

Operation of the Fund has certainly been profitable to Franklin. But that alone does not violate the Act. As far as can be determined on this record, the Fund's post-tax profitability to Franklin did not exceed 35%, even assuming significant "misallocation" of expenses. In *Schuyt* Judge Ward did not regard as excessive post-tax profitability of 29.5%, 33.9%, and 38.6% for the three years in question. 663 F.Supp. at 978–79. In *Krinsk,* Judge Walker declined to condemn profitability of "perhaps as much as 33%." 715 F.Supp. at 494. More significant than these comparisons, however, are the particular facts and circumstances of the fund at issue. Superior performance operates to justify a relatively high fee, which in turn increases profitability. In this case, I conclude that the profitability of the Fund to Franklin neither re-

quires nor supports a finding that Franklin's fees were so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arms-length bargaining.[12]

Plaintiffs have failed to prove that Franklin realized economies of scale as the Fund increased in size, or that economies of scale, if realized, were not shared with investors.

The Fund's independent directors were well qualified to discharge their fiduciary duties, received adequate information from Franklin and appropriate advice from their counsel, and acted conscientiously and carefully. They approved the management fees at issue in this case. The Act does not permit the Court to substitute its business judgment for that of the Fund's board of directors in the area of management fees.

The most troublesome aspect of the case lies in the allocation of distribution expenses. For the reasons stated, the record does not support the conclusion that the directors acted improperly in that regard, or in any other. But they may wish to keep these particular concerns in mind when passing upon future management contracts.

The plaintiffs have failed to sustain their burden of proving that the fees at issue during these years were so excessive as to constitute a breach of fiduciary duty under § 36(b).

The Clerk of the Court is directed to dismiss the complaint with prejudice. Defendants may tax a statutory bill of costs.

It is SO ORDERED.

---

**12.** That is so whether or not certain expenses allocated to management should have been allocated to underwriting. Furthermore, an adviser-manager's payment of distribution expenses, even in the absence of a Rule 12b–1 plan, does not constitute a *per se* violation of § 12(b) of the Act. The SEC has explained that an indirect use of funds to finance distribution, as contemplated by Rule 12b–1, does not occur "if an adviser makes distribution related payments out of its own resources." An adviser may make distribution expenditures from its profits from the advisory contract. "To the extent that such profits 'are legitimate' or 'not excessive,' the adviser's distribution expenses are not an indirect use of fund assets. . . . . Profits which are legitimate and not excessive are simply those which are derived from an advisory contract which does not result in a breach of fiduciary duty under section 36 of the Act." SEC Docket, Volume 21, No. 5, November 11, 1980 (quoted in *Schuyt* at 663 F.Supp. 987 n. 74).